**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ANTHONY ROBINSON,** | : | |
| **Petitioner** | : | **No. 1:25-cv-00370** |
| | : | |
| **v.** | : | **(Judge Kane)** |
| | : | |
| **SUPERINTENDENT HAINSWORTH,** | : | |
| **et al.,** | : | |
| **Respondents** | : | |

**MEMORANDUM**

Currently before the Court is pro se Petitioner Anthony Robinson ("Robinson")'s petition for a writ of habeas corpus under 28 U.S.C. § 2254, in which he challenges a decision by the Pennsylvania Parole Board (the "Board") to rescind his automatic reparole after he was recommitted to state prison following a technical parole violation. For the reasons stated below, the Court will deny the petition, decline to issue a certificate of appealability, and direct the Clerk of Court to close this case.

## I. BACKGROUND

### A. State Proceedings

On March 1, 2000, the Court of Common Pleas of York County ("CCP") sentenced Robinson to an aggregate period of state incarceration for a minimum of fourteen-and-a-half years to a maximum of twenty-nine years after a jury found him guilty of rape by forcible compulsion (18 Pa. C.S. § 3121(a)(1)), involuntary deviate sexual intercourse by forcible compulsion (18 Pa. C.S. § 3123(a)(1)), sexual assault (18 Pa. C.S. § 3124.1), indecent assault without consent (18 Pa. C.S. § 3126(1)), two counts of simple assault (18 Pa. C.S. § 2701(a)), and terroristic threats (18 Pa. C.S. § 2706). See (Doc. No. 7-2 at 1); Docket, Commonwealth v. Robinson, No. CP-67-CR-0003901-1999 (York Cnty. Ct. Com. Pl. filed Aug. 25, 1999) ("CCP

Dkt. I").[1] Over the next decade, Robinson challenged his convictions and sentence via post-sentence motions, a direct appeal, several post-conviction collateral relief petitions, and several collateral appeals, all of which were unsuccessful. See CCP Dkt. I.

While incarcerated in state prison, Robinson was charged with, and pleaded guilty to, assault by a prisoner (18 Pa. C.S. 2703(a)), for which the CCP sentenced him to a period of state incarceration for a minimum of three years to a maximum of six years, with this sentence to run concurrent to his existing sentence. See (Doc. No. 7-2 at 1); Docket, Commonwealth v. Robinson, No. CP-67-CR-0007599-2006 (York Cnty. Ct. Com. Pl. filed Dec. 14, 2006) ("CCP Dkt. II"). Although Robinson did not file a direct appeal from his sentence, he did file collateral challenges, which were unsuccessful. See CCP Dkt. II.[2]

On March 13, 2019, the Board granted Robinson parole on or after July 1, 2019, "to an approved plan upon condition that there are no misconducts." See (Doc. No. 7-3 (cleaned up)). The Board also imposed the following additional conditions:

> You shall maintain employment as approved by parole supervision staff. If unemployed, you shall engage in an active job search and provide verification as directed by parole supervision staff.

---

[1] The Court takes judicial notice of the docket for Robinson's underlying criminal cases, including any related appellate proceedings, referenced in this Memorandum, all of which are available on the Unified Judicial System of Pennsylvania Web Portal (https://ujsportal.pacourts.us/CaseSearch). See Orabi v. Att'y Gen. of the U.S., 738 F.3d 535, 537 n.1 (3rd Cir. 2014) (stating that the court "may take judicial notice of the contents of another [c]ourt's docket"); Wilson v. McVey, 579 F. Supp. 2d 685, 688 n.5 (M.D. Pa. 2008) (taking judicial notice of court docket). The Court also notes that it appears from Respondents' exhibits and the docket that Robinson was also charged with endangering the welfare of children (18 Pa. C.S. § 4304), aggravated assault (18 Pa. C.S. § 2702), and false imprisonment (18 Pa. C.S. § 2903); however, the ultimate disposition of those charges is unclear.

[2] According to Respondents, Robinson's sentences resulted in him having a parole minimum date of January 25, 2014, and a parole maximum date of July 25, 2028. See (Doc. No. 7-2 at 1, 3, 4).

> You shall comply with supervision under the domestic violence protocol—Mandatory.
>
> You shall obey curfew restrictions as deemed appropriate by field supervision staff.
>
> Upon your release, you shall submit to an evaluation to determine your need for sex offender treatment/service. If treatment is recommended, you must enroll and successfully complete all treatment recommended. You shall be required to sign the appropriate release forms for confidential information.
>
> You shall achieve negative results in screening tests randomly conducted by the Board to detect your use of controlled substances and designer drugs, as designated by the Controlled Substance, Drug, Device and Cosmetic Act, or to detect your use of alcohol, or both. You are responsible for all testing costs.
>
> You shall not consume or possess alcohol under any condition for any reason.
>
> You shall not enter establishments that sell or dispense alcohol except as approved by parole supervision staff.
>
> Impose all 14 standard special conditions for sex offenders.
>
> You shall not directly or indirectly have contact with victim(s), or victim's families, including correspondence, telephone contact, or communication through third parties—Mandatory.
>
> You shall not possess ammunition under any condition or for any reason.
>
> You shall pay a monthly supervision fee as determined by parole supervision staff to the Board while under supervision within the Commonwealth of Pennsylvania (Act 35 of 1991).
>
> When released to the community you must report in person to the district office or sub-office the next business day (Monday through Friday) between the working hours of 8:30 a.m. – 5:00 p.m. The decision announced by this Board action (PBPP-15) will not take effect until you have signed the conditions (PBPP-11), and the release orders (PBPP-10) have been issued. You remain under the jurisdiction and control of the Department of Corrections until you have signed the PBPP-11, and the PBPP-10 has been issued. This PBPP-15 does not authorize you to change your residence from any community corrections center or group home in which you may be residing when you receive it.

See (id. at 2).

On September 10, 2019, the Board issued an Order releasing Robinson on parole from Pennsylvania State Correctional Institution Laurel Highlands ("SCI Laurel Highlands") to Keystone Correctional Services, in Harrisburg. See (Doc. No. 7-4 at 1). The Order releasing Robinson again stated that his release was conditioned on "no misconducts." See (id. (cleaned up)). The Order also contained numerous other conditions, including, inter alia, that Robinson "refrain from any assaultive behavior." See (id. at 3–6).

On January 16, 2020, approximately four months after his release on parole, Robinson waived his right to, inter alia, a preliminary hearing and violation hearing, and admitted to being discharged from the Community Corrections Center ("CCC") for assaultive behavior in violation of the terms of his parole. See (Doc. No. 7-5 at 1, 5); Robinson v. Pa. Parole Bd., 306 A.3d 969, 971 (Pa. Commw. Ct. 2023). As a result of this behavior, Robinson was returned to SCI Laurel Highlands. See Robinson, 306 A.3d at 971.

A week later, the Board determined that there was probable cause for Robinson's parole violation but held his recommitment in abeyance pending completion of recommended programing. See (Doc. Nos. 1-1 at 2; 7-6 at 1; 7-7 at 1). However, on February 6, 2020, the Parole Violation Center ("PVC") to which Robinson was referred rejected his placement "due to [his] medical needs (dialysis), indicating that he [was] unable to be managed in a PVC." See (Doc. No. 7-7 at 1).

On March 30, 2020, the Board recommitted Robinson as a technical parole violator ("TPV") for up to six months to a CCC for violations of his parole. See (Doc. Nos. 1-2 at 2; 7-8 at 1); Robinson, 306 A.3d at 971. The Board also ordered that Robinson would be "reparoled automatically without further action of the Board, upon successful completion of all

recommended programs, provided [he is] in good standing with the Board." See (Doc. Nos. 1-2 at 2 (cleaned up); 7-8 at 1 (cleaned up)); Robinson, 306 A.3d at 971.

Via a memorandum dated June 24, 2020, a parole supervisor at Pennsylvania State Correctional Institution Laurel Highlands informed the Board that Robinson was "not in good standing with the Board's release procedures and policies." See (Doc. No. 7-9 at 1). The supervisor's memorandum indicated in relevant part as follows:

> On April 30, 2020, Robinson was given a bed date for July 10, 2020 at Harrisburg CCC, however, the Bureau of Community Corrections ("BCC") withdrew the bed date on May 18, 2020, due to a [victim of an assault] residing at the center.
>
> On June 8, 2020, Robinson was given a bed date for July 10, 2020 at Self Help in Philadelphia.
>
> On June 15, 2020, Robinson refused his bed date at Self Help noting health concerns. At that point, he requested to reside in Harrisburg and indicated he would provide a list of landlords that his sister was going to provide to him.
>
> On June 15, 2020, I notified the BCC that Robinson is refusing Self Help and [the] bed date was withdrawn. I instructed the BCC to find placement in or near Harrisburg per Robinson's request.
>
> On June 22, 2020, a bed date was established for July 10, 2020 at Firetree Capitol Pavilion in Harrisburg.
>
> On June 22, 2020, Agent Weimer received landlord listing from [Department of Corrections] Counselor Galentine that Robinson received from his sister. Agent Weimer reached out to the landlord of choice, who requires $750 rent/security deposit prior to completing a home plan for investigation. Agent Weimer reached out to field agent in Harrisburg via email in regards to this landlord and any insight that could be provided to Robinson.
>
> On June 23, 2020, Agent Spangler responded indicating he has worked with this landlord, Mr. Peffley, in the past, noting at this location Robinson would have no windows or AC in his room.
>
> On June 24, 2020, Agent Welmer called up Robinson to complete an Adam Walsh PSP change of address to the Firetree Capitol Pavilion for July 10, 2020, as well as explain the status of the possible home plan. It should be noted that Robinson is a registered sex offender and dialysis patient, which involves multiple parties to prepare him for release on July 10, 2020. In the presence of Agent Fleegle and I,

> Robinson refused the Firetree Capitol Pavilion, refused to register for Adam Walsh change of address, and indicated he would not consider the home plan option either.

See (id. (cleaned up)). Based on the events described in this memorandum, the supervisor recommended that the Board refuse Robinson automatic reparole and review, explaining that "[b]ased on our experience with Robinson, he is not in good standing with the Board as he is refusing all release options and being non-cooperative with the required Megan's Law registration and placements." See (id. at 3 (cleaned up)); see also Robinson, 306 A.3d at 971 & n.3 (explaining that Robinson "twice refused placement at a CCC").

On July 9, 2020, the Board issued a warrant to commit and detain Robinson. See (Doc. No. 7-10); Robinson, 306 A.3d at 971–72. The Board then scheduled a parole rescission hearing for July 23, 2020. See Robinson, 306 A.3d at 972. During the hearing, Robinson "explained that his refusals were due to health concerns amid the COVID-19 pandemic" insofar as he was "on dialysis and wished to avoid the crowded environment at a CCC." See id.

On August 4, 2020, the Board rescinded the automatic reparole portion of its March 30, 2020 Order and agreed to consider an approved home plan or after January 2021. See id.; (Doc. Nos. 1-3; 7-11). Robinson then pursued administrative relief from the Board's August 4, 2020 decision through a submission transmitted to the Board in September 2020, in which he asserted a violation of his Eighth Amendment right of protection against cruel and unusual punishment. See (Doc. No. 1-4 at 2); Robinson, 306 A.3d at 972.[3] The Board issued a response dated

---

[3] Although exhaustion of state court remedies is not an issue in this habeas case, to provide context to the procedural history of this case, the Court notes that, to properly exhaust a claim challenging the Board's rescission/revocation of parole, recommitment, and recalculation of the sentence, a Section 2254 habeas petitioner must first file an appeal or a petition for administrative review with the Board. See 37 Pa. Code § 73.1(a) ("An interested party, by counsel unless unrepresented, may appeal a revocation decision."); id. § 73.1(b) ("A parolee, by counsel unless unrepresented, may petition for administrative review under this subsection of determinations relating to revocation decisions which are not otherwise appealable under

November 2, 2021, in which it found "no grounds to grant administrative relief" and affirmed its August 4, 2020 decision. See (Doc. No. 1-4 at 2); Robinson, 306 A.3d at 972. In this response, the Board explained its reasons for rejecting Robinson's administrative appeal as follows:

> The decision in question rescinded the automatic re-parole portion of the Board decision recorded March 30, 2020 and listed you for re-parole interview in January 2021. The record reveals that during the rescission hearing held on July 23, 2020, you admitted that you failed to cooperate with the release process during which you refused placement in two separate programs in the community. The Board relied upon the evidence presented at the hearing, the agent's testimony, and your admission to your failure to be place[d] in a treatment program sufficient cause to rescind your parole. The panel agrees the evidence, testimony, and your admission are sufficient to support the rescission.
>
> The scope of review of an administrative appeal is limited to whether the decision is supported by substantial evidence, an error of law has been committed, or there has been a violation of constitutional law. 37 Pa. Code § 73.1 The record in this matter reveals the decision recorded August 4, 2020 (mailed 8/10/2020) is

---

subsection (a)."). The filing of an appeal or a petition for administrative review postpones the finality of the Board's rescission/revocation decision "for purposes of appeal to a court until the [Parole] Board has mailed its decision on the appeal [or] . . . response to the petition for administrative review." See id. §§ 73.1(a)(1), (b)(1). Once the Board resolves the appeal or petition for administrative review, the petitioner must file a petition for review in the Commonwealth Court of Pennsylvania. See 42 Pa. C.S. § 763(a) (establishing Commonwealth's exclusive appellate jurisdiction in certain cases, such as in, inter alia, "[a]ll appeals from . . . any Commonwealth agency having Statewide jurisdiction"); Commonwealth v. Fells, 518 A.2d 544, 544 (Pa. 1986) (explaining that challenges to the Board's revocation of parole "are in the appellate jurisdiction of the Commonwealth Court"); Borsello v. Colleran, 833 A.2d 1213, 1215 (Pa. Commw. Ct. 2003) ("Appeals of the Board's parole revocation and recommitment orders are within the exclusive appellate jurisdiction of the Commonwealth Court."). If the petitioner is unsuccessful in the Commonwealth Court, they must seek further review in the Pennsylvania Supreme Court before bringing a federal habeas action. See Williams v. Wynder, 232 F. App'x 177, 180 (3d Cir. 2007) (unpublished) (concluding that Pennsylvania Supreme Court's Administrative Order 218 does not apply to appeals from Commonwealth Court decisions); Jones v. Tritt, No. 16-cv-01741, 2019 WL 314718, at *2 (M.D. Pa. Jan. 24, 2019) ("If a petitioner . . . fails to seek review from the Pennsylvania Supreme Court of an unfavorable disposition by the Commonwealth Court, then the claim remains unexhausted." (citing Williams, 232 F. App'x at 180)); see also Jackson v. Clark, No. 17-cv-00249, 2018 WL 3040369, at *2 (W.D. Pa. May 16, 2018) (explaining that petitioner claiming that the Parole Board "erred in calculating his parole violation maximum sentence date" had to exhaust state-court remedies before filing Section 2254 petition), report and recommendation adopted, 2018 WL 3037189 (W.D. Pa. June 19, 2018).

> supported by substantial evidence, does not constitute an error of law, and does not violate your constitutional rights.

See (Doc. No. 1-4 at 2); see also Robinson, 306 A.3d at 972 (indicating that "[t]he Board explained that it rescinded [Robinson]'s automatic reparole because [he] twice refused placement into a CCC" (citation omitted)).

Following the Board's rejection of his administrative appeal, Robinson filed a pro se petition for a writ of mandamus with the Pennsylvania Commonwealth Court on or about April 21, 2022. See (Doc. No. 7 at 4); Robinson, 306 A.3d at 972; Docket, Robinson v. Pa. Parole Bd., No. 253 MD 2022 (Pa. Commw. Ct. filed Apr. 22, 2022) ("Commw. Dkt."). The Board filed preliminary objections to Robinson's petition in the nature of a demurrer in which it asserted that "(1) Robinson lack[ed] a clear right to the relief requested and (2) [it] lack[ed] a corresponding duty to grant the requested relief." See Robinson, 306 A.3d at 972 (footnote and citation omitted).

On November 30, 2023, the Commonwealth Court issued a decision granting the Board's preliminary objections to Robinson's petition and dismissing the petition with prejudice. See id. at 976. In its decision, the Commonwealth Court, after setting forth the law applicable to mandamus petitions in Pennsylvania, see id. at 972–73, summarized the parties' arguments as follows:

> In its preliminary objections, the Board asserts that [Robinson] cannot establish a clear right to relief or that the Board had a duty to grant the relief requested. According to the Board, its decision to rescind [Robinson's] automatic reparole was discretionary, and, thus, [his] mandamus claim fails. In support, the Board relies on Henderson v. Pennsylvania Parole Board, 277 A.3d 633 (Pa. C[ommw.] 2022), and focuses on [Robinson's] status while serving his recommitment and awaiting reparole. According to the Board, [Robinson] never achieved parolee status and, therefore, lacked any vested liberty interest to challenge the Board's discretionary act.

> Although his brief is difficult to parse, [Robinson] appears to challenge the Board's assertion that he was never a parolee. According to [Robinson], despite his ongoing confinement at SCI-Laurel Highlands, the Board's administrative actions document his status. Essentially, [Robinson] argues that he was paroled as of July 10, 2020, regardless of where he was housed at the time. [Robinson] also rejects the Board's reliance on Henderson. According to [Robinson], Henderson merely precludes automatic reparole for those TPVs that commit assaultive misconducts. Because [Robinson] never received a misconduct for assaultive behavior, [he] contends that Henderson is inapposite. [Robinson] also suggests that the Board's efforts to deny his parolee status reveal an underlying strategy to deprive him of due process rights, ignore the public health concerns prevalent at the time, and punish him for seeking more favorable housing.

See id. at 973–74 (internal citations omitted).

After reciting these arguments, the Commonwealth Court determined that Henderson, "[w]hile not directly on point," was persuasive. See id. at 974.[4] It found that Henderson was

[4] The Commonwealth Court described its decision in Henderson as follows:

> The Board recommitted Henderson as a TPV to serve six months' backtime with automatic reparole. Following his recommitment, Henderson received a disciplinary misconduct for assaultive behavior. Accordingly, the Board rescinded his automatic reparole without a hearing. Henderson sought administrative relief, which the Board denied, citing in support Section 6138(d)(5) of the Code.
>
> Henderson then petitioned this Court for appellate review, asserting a violation of his due process rights because the Board had rescinded his reparole without a hearing, but this Court denied relief. Relying upon the plain language of Section 6138, the Court concluded that the recommitment period and automatic reparole provisions "shall not be applicable" to a TPV who has committed assaultive behavior. Further, as the Board's authority was limited to "those powers conferred upon it by the General Assembly in clear and unmistakable language," the Court opined that the Board was prohibited from granting the parolee relief.
>
> In addressing the Board's rescission without a hearing, the Court also clarified a TPV's status during his recommitment. According to the Court, "a grant of parole by itself does not vest a prisoner with any protected liberty interest in that parole." The grant of parole is executed when "the prisoner signs the acknowledgement of parole conditions . . . and the Board issues its parole release order . . . ." Because those steps had not occurred, Henderson had not attained the status of a parolee.

See id. at 974–75 (internal footnotes and citations omitted).

"instructive for two reasons. First, a prisoner does not attain the status of a parolee until the grant of parole is actually executed. Second, a TPV's conduct following recommitment may endanger or even void an automatic reparole." See id. at 975 (internal quotation marks and citations omitted).

The Commonwealth Court then explained its reasoning for granting the Board's preliminary objections and dismissing Robinson's mandamus petition as follows:

**C. Robinson Lacks a Vested Liberty Interest in his Reparole**

> [Robinson's] status is relevant to whether he has a clear right to relief. See Toland[ v. Pa. Bd. of Prob. & Parole, 263 A.3d 1220, 1232 (Pa. Commw. Ct. 2021)]; Clark[ v. Beard, 918 A.2d 155, 159 (Pa. Commw. Ct. 2007)]. It is evident that [Robinson] never attained parolee status following his recommitment in January 2020. Whatever the precise circumstances surrounding his unsuccessful discharge from the Harrisburg CCC, upon his recommitment to SCI-Laurel Highlands, [Robinson was confined as a prisoner housed at that institution. As memorialized by the Board's written decision, "[w]hile confined [Robinson] must abide by the rules and regulations of the institution and comply with the institution's prescriptive program requirements[.]" Pet., Ex. B, Notice of Bd. Dec., 3/30/20, at 1 (unnecessary capitalization removed). Further, the Board informed [Robinson] that he was eligible for automatic reparole but clarified that "this Board action will not take effect until you have signed the conditions . . . [,] and the release orders . . . have been issued." Id. at 3 (unnecessary capitalization removed; emphasis added).
>
> [Robinson] has not pleaded, nor is it a reasonable inference from his exhibits, that he signed a form documenting the conditions of his release on parole or that the Board issued orders executing his release. Therefore, on this record and in accordance with this Court's precedent, [Robinson's] assertion that he attained parolee status is incorrect.
>
> In Henderson, the petitioner's status as a prisoner, rather than a parolee, was significant because it relieved the Board of an obligation to provide him with advance notice and a hearing before rescinding his automatic reparole. In this case, the Board afforded [Robinson] a hearing before rescinding his automatic reparole. Nevertheless, [Robinson's] status is no less significant here in this mandamus action because it demonstrates that he lacks a vested liberty interest in his reparole. See Henderson, 277 A.3d at 637. Because he lacks a vested liberty interest in his reparole, he has no clear legal right to the relief requested, and his mandamus action fails. See Toland, 263 A.3d at 1232; Clark, 918 A.2d at 159.

> **D. The Board has No Duty to Grant [Robinson] Reparole**
>
> This is not a case in which the Board has failed or refused to abide by its statutory duties. The Board's decision to rescind [Robinson's] reparole based on his conduct following recommitment was an appropriate exercise of its discretion. See Coady[ v. Vaughn, 770 A.2d 287, 290 (Pa. 2001)]; Johnson[ v. Pa. Bd. of Prob. & Parole, 532 A.2d 50, 53 (Pa. Commw. Ct. 1987)]. The Board's broad discretion in parole matters is tempered by a statutory duty to provide a brief statement of the reasons for its decision. Homa[ v. Pa. Bd. of Prob. & Parole, 192 A.3d 329, 334 (Pa. Commw. Ct. 2018) (citing 42 Pa. C.S. § 6139(a)(5)).[5] In Homa, for example, the Board issued letters explaining that it had denied the prisoner automatic parole upon reaching his minimum sentence date because, inter alia, he had an unsatisfactory supervision history. [192 A.3d at 331].
>
> Here, in its response to [Robinson's] administrative appeal, the Board explained that it had rescinded [his] reparole because he "failed to cooperate with the release process during which [he] refused placement in two separate programs in the community" and refused "placement in a treatment program[.]" Pet., Ex. H, Bd.'s Resp., 11/2/21, at 1. The Board's response articulated the basis for its decision. It therefore complied with its statutory duty. See Homa, 192 A.3d at 334; 61 Pa. C.S. § 6139(a)(5).
>
> Accordingly, [Robinson] cannot establish the Board has a duty to grant the relief requested, and his mandamus action fails on this ground as well. See Coady, 770 A.2d at 290; Weaver[ v. Pa. Bd. of Prob. & Parole, 688 A.2d 766, 777 (Pa. Commw. Ct. 1997)]; Toland, 263 A.3d at 1232; Homa, 192 A.3d at 334.
>
> Indeed, [Robinson's] conduct deprived the Board of authority to grant reparole. Section 6138(d)(5)(iii) of the Code provides that the time limits placed on a TPV recommitted to a SCI "shall not be applicable" to a prisoner that has "refused programming." 61 Pa. C.S. § 6138(d)(5)(iii). Thus, as this Court recognized in Henderson, the Board lacked authority to grant [Robinson] the relief requested "because it was affirmatively prohibited from doing so . . . ." Henderson, 277 A.3d at 636–37. For this reason, too, the Board had no duty to grant [Robinson] the relief he requested.

See id. at 975–76 (some alterations in original) (footnote in original).

After the Commonwealth Court denied him relief, Robinson filed an appeal with the Pennsylvania Supreme Court on or about January 1, 2024. See Commw. Dkt. On October 24,

[5] "[W]henever parole is refused by the [B]oard, a brief statement of the reasons for the [B]oard's action shall be file of record . . . ." 61 Pa. C.S. § 6139(a)(5).

2024, the Pennsylvania Supreme Court issued an Order affirming the Commonwealth Court's decision. See (Doc. No. 7-13); Robinson v. Pa. Parole Bd., 328 A.3d 467 (Pa.) (table decision).[6]

**B. Federal Proceedings**

Robinson commenced the instant action by filing his Section 2254 petition on February 24, 2025. (Doc. No. 1.)[7] In his petition, Robinson argues that the Board violated his rights under the Due Process Clause of the Fourteenth Amendment by rescinding his automatic parole on August 4, 2020, and not holding a parole revocation hearing. See (id. at 5).[8] For relief, Robinson seeks an order reinstating his parole and immediately releasing him to a CCC. See (id. at 15).

On March 5, 2025, the Court issued an Order directing Respondents to file an answer to Robinson's habeas petition. (Doc. No. 5.) Respondents timely filed their answer and attached

---

[6] The Supreme Court also denied Robinson's application for leave to file a reply brief nunc pro tunc.

[7] The federal "prisoner mailbox rule" provides that a pro se prisoner's submission is deemed filed "at the time [the prisoner] delivered it to the prison authorities for forwarding to the court clerk." See Houston v. Lack, 487 U.S. 266, 276 (1988). Here, Robinson declares that he placed his petition in the prison's mail system on February 24, 2025. (Doc. No. 1 at 15). As such, the Court uses February 24, 2025, as the petition's filing date even though the Clerk of Court did not docket it until February 28, 2025.

Additionally, when Robinson filed his petition, he neither remitted the filing fee nor sought leave to proceed in forma pauperis. As such, an Administrative Order issued on February 28, 2025, requiring him to either pay the fee or file an in forma pauperis application within thirty days. See (Doc. No. 3). Robinson timely complied with the Administrative Order by remitting the fee on March 3, 2025. See (Doc. No. 4).

[8] Robinson did not file a memorandum of law with his petition, and his legal claim consists of a single sentence: "Violation of 14th Amendment Due Process Clause to the United States Constitution." See id. (cleaned up). However, he twice mentions that he believes that the Board unlawfully terminated his parole by recission rather than through a revocation hearing. See id. at 5, 6. As such, the Court construes Robinson's due process challenge as pertaining to the Board's decision to rescind his automatic reparole rather than hold a parole revocation hearing.

exhibits on March 19, 2025. (Doc. No. 7.) Robinson then timely filed a reply brief on April 8, 2025. (Doc. No. 10.)[9] Thus, Robinson's habeas petition is ripe for resolution.

## II. LEGAL STANDARD

A petition for writ of habeas corpus is the exclusive federal remedy for a state prisoner challenging the "very fact or duration" of their confinement and seeking "immediate release or a speedier release from that imprisonment." See Preiser v. Rodriguez, 411 U.S. 475, 498–99 (1973); Leamer v. Fauver, 288 F.3d 532, 542–44 (3d Cir. 2002). A district court is authorized to "entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that [they are] in custody in violation of the Constitution or laws or treaties of the United States." See 28 U.S.C. § 2254(a). Claimed violations of state law, standing alone, will not entitle a petitioner to relief, absent a showing that those violations are so great as to be of a constitutional dimension. See Estelle v. McGuire, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). Furthermore, a state prisoner seeking to invoke the power of this Court to issue a writ of habeas corpus must have exhausted the remedies available to them in the courts of the state. See 28 U.S.C. § 2254(b)(1)(A).

These same principles that limit habeas relief to errors of a constitutional dimension also require federal courts to give an appropriate degree of deference to the factual findings and legal

[9] On March 31, 2025, Robinson filed a motion to compel Respondents to comply with the Federal Rules of Civil Procedure (Doc. No. 8), to which Respondents filed an opposition brief on the same date (Doc. No. 9). On July 17, 2025, the Court issued an Order deeming Robinson's motion withdrawn due to his failure to file a brief in support of the motion in accordance with the Court's Local Rules. (Doc. No. 11.)

rulings made by the state courts during state criminal proceedings. There are two critical components to this deference mandated by Section 2254.

First, with respect to legal rulings by state courts, habeas relief is unavailable to a petitioner for any claim that has been adjudicated on its merits in state court unless it can be shown that the state court decision was either: (1) "contrary to" or involved an unreasonable application of clearly established case law; see id. § 2254(d)(1); or (2) was "based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," see id. § 2254(d)(2). Applying this deferential standard of review, federal courts frequently decline invitations by habeas petitioners to substitute their legal judgments for the considered views of the state trial and appellate courts. See Rice v. Collins, 546 U.S. 333, 338–39 (2006) (concluding that state court's decision on petitioner's peremptory challenge based on Batson v. Kentucky, 476 U.S. 79 (1986), "was not an unreasonable determination of the facts in light of the evidence presented to the state court"); see also Warren v. Kyler, 422 F.3d 132, 139–40 (3d Cir. 2005) (determining that state court's decision to apply presumption in the applicable version of 42 Pa. C.S. § 9714 was not "an objectively unreasonable application of clearly established federal law"); Gattis v. Snyder, 278 F.3d 222, 231 (3d Cir. 2002) ("We agree with the District Court that the state court decisions are not contrary to clearly established federal law.").

In addition, the determination of a factual issue by a state court is presumed to be correct unless the petitioner can show by clear and convincing evidence that this factual finding was erroneous. See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and

convincing evidence.”). This presumption in favor of the correctness of state court factual findings has been extended to a host of factual findings made during criminal proceedings. See, e.g., Maggio v. Fulford, 462 U.S. 111, 117 (1983) (per curiam) (explaining that under the applicable standard, “we have not the slightest hesitation in saying that the trial court’s conclusion as to [the defendant’s] competency was fairly supported by the record” (citation and internal quotation marks omitted)). This principle applies to factual findings made both by the state trial court and state appellate courts. See Rolan v. Vaughn, 445 F.3d 671, 679 (3d Cir. 2006) (“Generally, federal courts defer to state appellate court determinations of fact.”). Thus, this Court may not reassess credibility determinations made by the state courts and must give equal deference to both the explicit and implicit factual findings made by the state courts. See Weeks v. Snyder, 219 F.3d 245, 258 (3d Cir. 2000) (“[W]e must provide the same presumption of correctness required by § 2254(e)(1) to the state courts’ implicit factual findings as we provide to express findings of the state courts.” (citing Campbell v. Vaughn, 209 F.3d 280, 285–86 (3d Cir. 2000))). Applying this standard of review, federal courts may only grant habeas relief whenever “[o]ur reading of the PCRA court records convinces us that the Superior Court made an unreasonable finding of fact.” See Rolan, 445 F.3d at 681.

## III. DISCUSSION

### A. Analysis of Robinson’s Habeas Claim

As stated above, Robinson’s sole claim in this case is that the Board violated his Fourteenth Amendment due process rights when it rescinded his parole. Although Robinson did not file a memorandum along with his habeas petition or describe his claim in detail in his petition, see (Doc. No. 1 at 5, 6), he argues in his reply brief that the Board’s August 4, 2020 decision rescinding his parole violated Morrissey v. Brewer, 408 U.S. 471 (1972). See (Doc. No.

10 at 10–11). Therefore, the Court construes Robinson's petition as claiming that the decisions of the Board and the state courts were "contrary to" the clearly established law in Morrissey.[10]

In Morrissey, the Supreme Court concluded that "the Due Process Clause of the Fourteenth Amendment requires that a State afford an individual some opportunity to be heard prior to revoking [their] parole." See 408 U.S. at 472.[11] The Court explained that:

> the liberty of a parolee, although indeterminate, includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee and often on others. It is hardly useful any longer to try to deal with this problem in terms of whether the parolee's liberty is a 'right' or a 'privilege.' By whatever name, the liberty is valuable and must be seen as within the protection of the Fourteenth Amendment. Its termination calls for some orderly process, however informal.

See id. at 482.

After determining that a parolee has a liberty interest once paroled, the Court "turn[ed] to the question of what process is due" the parolee, see id. at 483, and concluded that "[w]hat is needed is an informal hearing structured to assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." See id. at 484. As for the "nature of the process that is due," the Court set forth the following two-step process. See id. at 485–89.

---

[10] Robinson never argues that the state courts' determinations were based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, and even if he did, he does not attempt to rebut any factual determinations by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Additionally, Robinson does not appear to argue that the Board and state courts' decision involved an unreasonable application of Morrisey. Even if he did, he would not be entitled to relief for the reasons stated in this Memorandum.

[11] The Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." See U.S. Const. amend. XIV § 1.

At the first step, "due process . . . require[s] that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available." See id. at 485 (citation omitted). This inquiry "should be seen as in the nature of a 'preliminary hearing' to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions." See id. (citation omitted). This hearing should occur before an independent officer, i.e. someone "other than the one who has made the report of parole violations or has recommended revocation," but they "need not be a judicial officer." See id. at 486. Additionally, as to this hearing before the independent officer: (1) "the parolee should be given notice that the hearing will take place and that its purpose is to determine whether there is probable cause to believe [they have] committed a parole violation"; (2) the parolee's notice "should state what parole violations have been alleged"; (3) "the parolee may appear [at the hearing] and speak in [their] own behalf[, and they] may bring letters, documents, or individuals who can give relevant information to the hearing officer"; (4) the parolee may request that the "person who has given adverse information on which parole revocation is to be based is to be made available for questioning in [their] presence"; (5) the hearing officer must "mak[e] a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parolee's position"; and (6) the hearing officer must "determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation." See id. at 486–87.

As for the second step, the Court determined that:

> There must also be an opportunity for a hearing, if it is desired by the parolee prior to the final decision on revocation by the parole authority. his hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined

> warrant revocation. The parolee must have an opportunity to be heard and to show, if [they] can, that [they] did not violate the conditions, or, if [they] did, that circumstances in mitigation suggest that the violation does not warrant revocation. The revocation hearing must be tendered within a reasonable time after the parolee is taken into custody.

See id. at 487–88. In addition, although the Court acknowledged that it "cannot write a code of procedure [because] that is the responsibility of each State," see id. at 488, it set forth the minimum requirements of due process for the revocation hearing, which include:

> (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against [them]; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.

See id. at 489.

In this case, Robinson's status at the time the Board rescinded automatic reparole on August 4, 2020, is relevant to this Court's determination as to whether the Board violated his due process rights because if he was a parolee, the Board would have been required to comply with Morrissey before rescinding his automatic parole (and essentially recommitting him to state prison) insofar as a parolee has a recognized liberty interest once paroled. See id. at 482; see also Robinson, 306 A.3d at 972 (recognizing that Robinson's "status [was] relevant to whether he has a clear right to relief"). Based on the Court's review of the record, the Commonwealth Court reasonably determined that Robinson was not a parolee at the time the Board rescinded automatic reparole.

In arguing that he remained a parolee at the time the Board rescinded automatic reparole, Robinson ignores a critical aspect of his parole proceedings, namely, his January 16, 2020 waiver of his right to a preliminary hearing and violation hearing. After Robinson was unsuccessfully

discharged from the Harrisburg CCC due to engaging in assaultive behavior, he signed a "Waiver of Violation Hearing and Counsel/Admission Form" (the "Form") on January 16, 2020. See (Doc. No. 7-5 at 6). The Form indicated that:

> I have been advised of my rights to a preliminary hearing, a violation hearing and counsel at those hearings. I have also been advised that there is no penalty for requesting counsel, that free counsel is available if I cannot afford to retain counsel, and the name and address of the local public defender. With full knowledge and understanding of these rights, I hereby waive my right to a preliminary hearing, a violation hearing and counsel at those hearings. I waive these rights of my own free will, without any promise, threat or coercion.

See (id.). On the Form, Robinson also "knowingly, intelligently, and voluntarily admit[ted] that[ he] was in violation of the terms and conditions of [his] parole" when he was unsuccessfully discharged from the Harrisburg CCC. See (id.).

Once Robinson executed the Form and waived his rights to, inter alia, a violation hearing, admitted that he violated the terms and conditions of his parole, and the Board recommitted him as a technical parole violator, Robinson was no longer a parolee and, as such, lacked a vested liberty interest in his reparole. See Greenholtz v. Inmates of Neb. Penal & Corr. Complex, 442 U.S. 1, 7 (1979) ("[T]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence."); Burkett v. Love, 89 F.3d 135, 139 (3d Cir. 1996) (recognizing general principle that Pennsylvania's parole statute does not create a liberty interest in the right to be paroled); Coady v. Vaughn, 770 A.2d 287, 289 (Pa. 2001) ("It is undisputed that [an inmate] does not have a clear legal right to the grant of parole, nor does the [Parole Board] have a corresponding duty to grant the same."); Rogers v. Pa. Bd. of Prob. & Parole, 724 A.3d 319 (Pa. 1999) (concluding that a grant of parole for Pennsylvania prisoners is nothing more than a possibility and constitutes a favor granted by the state as a matter of "grace and mercy"); see also Drummond v. Tritt, No. 16-cv-02135, 2019 WL 1405395,

at *2 (M.D. Pa. Mar. 28, 2019) ("The Pennsylvania Probation and Parole Act does not grant Pennsylvania state prisoners any constitutionally-protected liberty interest in being released on parole or reparole prior to the expiration of their maximum terms." (footnote and citations omitted)). He could not have regained that protected liberty interest unless the Board granted him reparole and that reparole was executed, see Douglas v. Pa. Parole Bd., No. 1107 C.D. 2022, 2024 WL 1845674, at *7 (Pa. Commw. Ct. Apr. 29, 2024) (unpublished) ("This Court has squarely rejected the assertion that due process requires the Board to hold a separate evidentiary hearing before rescinding a grant of automatic reparole on the basis of an assaultive misconduct where, as here, the grant of parole has not yet been executed." (citing Henderson, 277 A.3d at 638, and Miller v. Pa. Parole Bd., No. 9 C.D. 2021, 2021 WL 6057879, at *4–5 (Pa. Commw. Ct. July 30, 2021) (unpublished))), and that did not happen here because Robinson failed to comply with the Board's conditions for automatic reparole. See (Doc. No. 7-8 at 1 ("You are reparoled automatically without further action of the Board, upon successful completion of all recommended programs, provided you are in good standing with the Board.")).[12] Accordingly, Robinson fails to satisfy his burden to show that the Board's decision to rescind his parole or the state court determinations affirming the Board's decision were contrary to (or involved an unreasonable application of) Morrissey, and, consequently, he is not entitled to habeas relief in this case.

Although the Court will deny Robinson's habeas petition in this case, there are two additional aspects of the case which warrant discussion. The first aspect is that in arguing that

[12] The fact that Robinson believes he had a legitimate health-related reason for his failure to cooperate with his placement, see Robinson, 306 A.3d at 972 (pointing out that Robinson "explained that his refusals were due to health concerns amid the COVID-19 pandemic," and he "wished to avoid the crowded environment at a CCC" due to his need to receive dialysis), does not negate his failure/refusal to cooperate.

the Board violated his due process rights, Robinson ignores the fact that the Board held a hearing before rescinding his parole even though it appears that no such hearing was necessary under Pennsylvania law. See Henderson, 277 A.3d at 637 (concluding that the Board did not have to provide petitioner with advance notice and a hearing before rescinding his automatic reparole because petitioner was a prisoner and not a parolee). Although Robinson contends that he should have received a revocation hearing, see (Doc. No. 10 at 11–12), he never identifies any aspect of the Board's July 23, 2020 hearing that violated his due process rights under Morrissey.

The second aspect of this case is that it is unclear whether Robinson also contests the merits of the Board's decision to rescind his automatic reparole. Assuming, arguendo, that Robinson did challenge the Board's decision to rescind his automatic reparole, it appears that the Court would apply the same substantive due process standard applicable to habeas review of other discretionary decisions by the Board, such as when it denies an inmate parole. In those instances, the role of a federal court is confined to reviewing the substance of the state parole decision to determine whether the Board violated the petitioner's substantive due process rights by exercising its authority in an arbitrary and capricious, or constitutionally impermissible manner. See Block v. Potter, 631 F.2d 233, 236 (3d Cir. 1980); see also Diehl-Armstrong v. Pa. Bd. of Prob. & Parole, No. 13-cv-02302, 2014 WL 1871509, at *5 (M.D. Pa. May 7, 2014) ("Since a discretionary decision of the Parole Board denying an inmate early parole does not implicate any constitutionally [or state] protected liberty interest, the scope of federal judicial review of these decisions is necessarily quite limited."). To show a violation of substantive due process, a habeas petitioner must demonstrate that: (1) the Board's decision was based on impermissible reasons such as race, religion, or political beliefs, and/or (2) the Board failed to apply appropriate, rational criteria in reaching its determination to deny parole. See Block, 631

F.2d at 236; Bonsall v. Gillis, 372 F. Supp. 2d 805, 807 (M.D. Pa. 2005). "However, federal courts are not authorized by the due process clause to second-guess parole boards[,] and the requirements of substantive due process are met if there is some basis for the challenged decision." Coady, 251 F.3d at 487. The "relevant level of arbitrariness required to find a substantive due process violation involves not merely action that is unreasonable, but, rather, something more egregious, which we have termed at times 'conscience shocking' or 'deliberately indifferent.'" See Hunterson v. DiSabato, 308 F.3d 236, 247 (3d Cir. 2002) (citation omitted).

Here, Robinson falls far short of establishing that the Board acted in a conscience shocking or deliberately indifferent manner in rescinding his automatic reparole. As set forth in more detail above, Robinson refused to cooperate in the release process ahead of his July 10, 2020 automatic reparole date. According to the supervisor from SCI Laurel Highlands, they had "exhausted all viable placements within the BCC system," so there was no place to send Robinson. See (Doc. No. 7-9 at 2). Moreover, Robinson had not cooperated with "the required Megan's Law registration and placements." See (id. at 3). Therefore, the Board had some basis for rescinding Robinson's automatic reparole, and, thus, even if he asserted a substantive due process violation, such a claim would lack merit.

**B. Certificate of Appealability**

"Unless a circuit justice or judge issues a certificate of appealability [("COA")], an appeal may not be taken to the court of appeals from . . . the final order in a habeas proceeding in which the detention complained of arises out of process issued by a State court[.]" 28 U.S.C. § 2253(c)(1)(A). A COA may issue only if the applicant has made a substantial showing of the denial of a constitutional right. See id. § 2253(c)(2). When deciding whether to issue a COA after a denying a Section 2254 petition on the merits, the Court applies the following standard:

"The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." See Slack v. McDaniel, 529 U.S. 473, 484 (2000).

In this case, jurists of reason would not find the disposition of this case debatable, i.e., that Robinson's claim does not warrant habeas relief because it is meritless. Accordingly, the Court will not issue a COA in this case.

## IV. CONCLUSION

For the reasons stated above, the Court will deny Robinson's Section 2254 habeas petition, decline to issue a certificate of appealability, and direct the Clerk of Court to close this case. An appropriate Order follows.

s/ Yvette Kane
Yvette Kane, District Judge
United States District Court
Middle District of Pennsylvania